# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAUSTO JUAN BARAJAS, | 1:08-cv-01346-LJO-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| J.D. HARTLEY, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## RELEVANT HISTORY

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation ("CDCR") following his 1990 conviction for second-degree murder. (Exhibit 1, to Answer.) Petitioner was sentenced to fifteen years-to-life in prison. (Id.)

On September 24, 2007, Petitioner filed a state petition for writ of habeas corpus in the Los Angeles County Superior Court challenging the Board of Parole Hearings' ("Board") July 27, 2006 decision finding him unsuitable for parole. (Exhibit 2, to Answer.) The superior court denied the petition, finding that the Board's decision was supported by "some evidence" under California law. (Exhibit 3, to Answer.) Petitioner presented the same claims to the California Court of Appeal and California Supreme Court which were both denied without comment or citation. (Exhibits 4-7, to Answer.)

Petitioner filed the instant federal petition for writ of habeas corpus on September 8, 2008, in the United States District Court for the Central District of California. (Court Doc. 1.) On September 9, 2008, the petition was transferred to this Court. (Court Doc. 3.) Respondent filed an answer to the petition on January 7, 2009, and Petitioner filed a traverse on January 29, 2009. (Court Docs. 15, 16.)

## STATEMENT OF FACTS[1]

On November 19, 1988, at approximately 1:00 a.m. officers of the Los Angeles County Sheriff's Department received a call regarding an assault with a deadly weapon and gunshots being fired. The officers arrived at the location of Sunkist Avenue and Beckner Street. When the officers arrived they observed the victim lying on her back and saw what appeared to be a gunshot wound in her upper left arm. The projectile appeared to have exited the left arm and entered the left side of the body. Paramedics attempted to resuscitate the victim at the scene but were not able to do so. The victim was subsequently transported to Terrace Plaza Hospital where she was examined and pronounced dead at 3:55 a.m. Law enforcement investigation revealed that Petitioner and Jose Parada were responsible for the shooting and were arrested shortly thereafter.

During an interview conducted on October 15, 2003, Petitioner stated that on the evening of November 18, he walked from his house to a party a block and a half away. Petitioner was sixteen-years-old at the time. While at the party, Petitioner was asked by Jose Jesus Parada and Gilbert Temoco for a ride home. Petitioner borrowed a Mazda extended cab pickup with a camper shell on it to give them a ride home across town. Petitioner had met Parada and Temoco approximately a week before the night of the party. During the ride, Parada sat in the front seat and Temoco sat sideways on the back seat. Temoco had a 22-caliber rifle which he held close to the floor next to the base of the seat. Petitioner turned from Tomar Street-the location of the party-onto Beckner Street. As he drove toward Sunkist Avenue, he saw a station wagon parked on the side with a group of people standing behind it. As he was driving past them he heard Temoco say, "I am going to shoot," and then he heard a shot. When he looked in the rear view

---

[1] This statement of facts is quoted from the July 27, 2006, hearing which quoted from the June 2006 Board Report prepared by Correctional Counselor G. Cook. (Exhibit 2, Attachment A, to Answer.)

2

mirror, he saw Temoco sitting with the barrel of the rifle pointing out the rear window of the truck, and he fired the shot through the open back window of the camper shell toward the station wagon. Petitioner could see in the rear view mirror that people were running and he heard Temoco say, "I got somebody." Petitioner was scared and panicked and must have speeded up because the guys told him to slow down. Petitioner stated that he did not know what to do so he dropped Parada and Temoco on the corner of Main and Third Street, then went home. Petitioner knew the victim, Yvonne Ruiz from high school, and believed she was 16 or 17 years old when she was killed. Petitioner stated that he is the one to blame for the death of Yvonne because had he stopped the car before the reached they victim, she would still be alive.

On February 20, 2006, Petitioner amended his version of the incident as follows:

> Jose, Gilbert, and myself are to be blamed for the death of Yvonne. All three of us had a part in her death. If I had stopped the car she would probably be alive today.

(Exhibit 2, Attachment A, to Answer, at 7-10.)

## DISCUSSION

I.  Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), citing White v. Lambert, 370

F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its

1  independent judgment that the relevant state court decision applied clearly established federal law
2  erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A
3  federal habeas court making the "unreasonable application" inquiry should ask whether the state
4  court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

In this instance, the last reasoned decision of the Los Angeles County Superior Court, denied Petitioner's claims stating the following:

> The Court finds that there is some evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). It appears that the crime partners had practiced shooting prior to the fatal incident, and they were calculating the best way to retaliate against members of the rival gang. The motive for the crime was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). They shot at a group of young persons, including innocent bystanders, due to the incident in which a rival gang member had pulled a gun on one of the crime partners[.] There was no need to kill someone as a result of this provocative but non-life threatening incident.
>
> The Court also finds that there is some evidence to support the Board's finding that the Petitioner had one 115s. Cal. Code Regs., tit. 15, §2402, subd (b). However, the Board was incorrect in determining that this was a factor upon which parole could properly be denied[.] The 115 did not involve violence. However, the Board's decision may be upheld, despite flaws in its findings, if it is clear it would have reached the same decision even absent the errors. See In re Dannenberg (2005) 34 Cal.4th 1061, 1100. Here it is clear that the nature of the commitment offense, alone, was sufficient to support the Board's finding of unsuitability. See In re Morrall (2002) 102 Cal.App.4th 280, 301.
>
> In addition, the Board noted that the District Attorney's Officer had opposed the Petitioner's release[.] While this is also not a factor on which the

5

Board may rely to deny parole, such opposition may be properly considered. Penal Code § 3402.

The Board also noted several positive gains that the Petitioner had achieved while incarcerated. Specifically, the Petitioner's institutional behavior was exemplary and he appeared to take fully responsibility for his actions. However, it concluded that despite these gains, the Petitioner posed an unreasonable threat to public safety at the time of its hearing. Penal Code § 3041(b).

Finally, the Court finds that the Board did not err in denying the Petitioner parole for a period of three years. The reasons were specified in the Board's decision, and essentially repeated the rationale for denying parole. The reasons need not be completely different from those justifying the denial of parole, and a sufficient basis for the three-year denial did appear in the record as a whole. See In re Jackson (1985) 39 Cal.3d 464, 479[.]

As indicated in Rosenkrantz, supra, 29 Cal.4th 616, 677, it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole may outweigh evidence demonstrating suitability for parole, as long as there is some evidence to support the finding of unsuitability. See also, In re Jacobson (2007) 154 Cal.App.4th 849, 860, 65 Cal.Rptr.3d 222, and In re Hyde (2007) 154 Cal.App.4th 1200, 1213, 65 Cal.Rptr.3d 162.

Accordingly, the petition is denied.

(Exhibit 3, to Answer.)

II.     Review of Claims

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability. Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d

703, 705 (9th Cir.1987).

"In <u>Superintendent v. Hill</u>, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974)." <u>Sass</u>, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. <u>Id</u>. Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. <u>Id</u>., *citing* <u>Superintendent v. Hill</u>, at 455-56. Although <u>Hill</u> involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." <u>Id</u>., *citing* <u>Jancsek v. Oregon Bd. of Parole</u>, 833 F.2d at 1390.

In making a determination whether an inmate is suitable for parole, the Board is guided by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs. §§ 2402(a) and (b).

In this case, with regard to the procedural protections outlined in <u>Greenholtz</u>, Petitioner was provided all that is required. Petitioner was given advance notice of the hearing, he was offered representation by counsel at the hearing, he was granted an opportunity to submit materials for the Board's consideration and an opportunity to be heard during the hearing, and he was provided a written decision explaining the reasons why parole was denied. <u>See</u> Exhibit 2,

1  Attachment A, to Answer.

2  The California Supreme Court clarified the standard of the review applicable to parole decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008). The applicable standard "is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." Id. at 1212 (emphasis in original and citations omitted). As to the circumstances of the commitment offense, the Court concluded that

> although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.[2]

Although the Board found Petitioner unsuitable for parole based on the circumstances of his commitment offense and institutional behavior, along with the opposition by the District Attorney's office, under AEDPA this Court is limited to reviewing the reasonableness of the last reasoned state court decision of the Los Angeles County Superior Court, which found the circumstances of the commitment offense, by itself, was some evidence of the reasonableness of the Board's decision.[3]

In this instance, the Board found that the commitment offense was carried out in an especially cruel and callous manner. In the early morning hours on November 19, 1989, victim Yvonne Ruiz-who was 17 years at the time-was an innocent bystander who was shot and killed.

---

[2] To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification." In re Shaputis, 44 Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

[3] The Board also cited the District Attorney's office opposition, but stated that was insufficient alone to justify denial of parole, but can and was properly considered by the Board. The Superior Court relied solely on the circumstances of the commitment offense to justify the Board's denial of parole.

8

1 The Board found that the offense was very dispassionate and calculated as the victim was minding
2 her own business and posed no particular threat, or that any other individuals within her group
3 posed any threat. On that evening, Petitioner and two associates-one armed with a .22-rifle drove
4 into rival gang territory. As Petitioner drove past a group of individuals, he heard Temoco state
5 "I am going to shoot," and then he heard shots fired. The victim suffered two gun shot wounds
6 from a .22-caliber rifle-one wound to the arm and the second to the left chest area that perforated
7 her artery. Petitioner and his associates fled the scene. Although paramedics attempted to
8 resuscitate the victim, she was pronounced dead shortly after arriving at the hospital. The Board
9 found the motive-a gang retaliation shooting-to be very trivial as the victim's only plight was
10 being at the wrong place at the wrong time. (Exhibit 2, Attachment A, at 50.) Petitioner
11 admitted that he was a member of the Dial Street Puente gang at the time of the commitment
12 offense and the shooting took place in rival gang territory. (Id. at 14-15.) Petitioner also
13 admitted that he noticed some of the individuals standing beside the station wagon and did not see
14 any weapons nor were any threatening comments made by them. (Id. at 15-16.) The Board
15 concluded that because Petitioner's gains were recent, he must continue to maintain them over a
16 longer period of incarceration. (Id. at 51-52.)

17 At this time and on this record, the Court finds that the circumstances of the commitment
18 offense support the Board's finding that Petitioner presents an unreasonable danger to public
19 safety. In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003), the Ninth Circuit stated that
20 "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and
21 conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison
22 system and could result in a due process violation." Although a denial of parole initially can be
23 justified by relying on the gravity of the offense, over time, "should [the prisoner] continue to
24 demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply
25 because of the nature of [his] offense and prior conduct would raise serious questions involving
26 his liberty interest in parole." Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007), *citing* Biggs, 334
27 F.3d at 916. Nevertheless, in both Irons and Biggs, the Ninth Circuit upheld the denials of parole
28 because in each of these cases the prisoner had not yet served the minimum term of his sentence.

1  In this instance, Petitioner's life term began on March 6, 1991, and he became eligible for parole
2  on December 27, 1999. This was only Petitioner's third subsequent suitability hearing. He had an
3  initial hearing in 1999, a second hearing in 2002, and a one-year stipulation to continue in 2004
4  for a current psychological evaluation. Thus, at the time of the 2006 hearing Petitioner had
5  served just over four months beyond his minimum-term (first hearing subsequent to serving
6  minimum term), and the due process concerns noted in Biggs and its progency are not yet present
7  because there has not been a continuous and repeated denial of parole based on the immutable
8  circumstances of the commitment offense. Moreover, there is no set formula for determining
9  when the denial of parole based solely upon the commitment offense violates due process. See
10 Irons v. Carey, 505 F.3d at 853-854 ("All we held in those cases [Biggs, 334 F.3d at 912; Sass v.
11 California Board of Prison Terms, 461 F.3d 1123, 1125 (9th Cir. 2006)] and all we hold today,
12 therefore, is that, given the particular circumstances of the offenses in these cases, due process
13 was not violated when these prisoners were deemed unsuitable for parole prior to the expiration
14 of their minimum terms.") Even if there is a doubt about the probative value of Petitioner's
15 commitment offense, this Court "may not issue the writ simply because [it] concludes in its
16 independent judgment that the relevant state-court decision applied clearly established federal law
17 erroneously or incorrectly." Lockyer, 538 U.S. at 75.

18     In addition, prior to rendering its decision, the Board also cited and considered the
19 positive factors supporting suitability, including obtaining his high school diploma, work toward
20 AA degree, participation in self-help programming, and positive employment history. 15 Cal.
21 Code Regs. § 2402(d); Exhibit 2, Attachment A, at 27-32. However, on balance, these positive
22 factors did not outweigh the factors of unsuitability. Accordingly, the state courts' determination
23 of this issue was not contrary to, or an unreasonable application of, clearly established Supreme
24 Court precedent. 28 U.S.C. § 2254(d).

25 RECOMMENDATION
26     Based on the foregoing, it is HEREBY RECOMMENDED that:
27     1.    The instant petition for writ of habeas corpus be DENIED; and,
28     2.    The Clerk of Court be directed to enter judgment in favor of Respondent.

1  This Findings and Recommendation is submitted to the assigned United States District
2  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of
3  the Local Rules of Practice for the United States District Court, Eastern District of California.
4  Within thirty (30) days after being served with a copy, any party may file written objections with
5  the court and serve a copy on all parties. Such a document should be captioned "Objections to
6  Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and
7  filed within fourteen (14) after service of the objections. The Court will then review the
8  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that
9  failure to file objections within the specified time may waive the right to appeal the District
10 Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

11 IT IS SO ORDERED.

12 **Dated:   January 27, 2010**                    **/s/ Dennis L. Beck**
                                                    UNITED STATES MAGISTRATE JUDGE